Filed 5/7/25  J.G. v. Superior Court CA1/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| J.G.,<br><br>    Petitioner,<br><br>v.<br><br>THE SUPERIOR COURT OF SAN FRANCISCO COUNTY,<br><br>    Respondent;<br><br>SAN FRANCISCO COUNTY HUMAN SERVICES AGENCY,<br><br>    Real Party in Interest. | A172430<br><br>(San Francisco City & County Super. Ct. No. JD23-3206) |

J.G. (Mother) seeks extraordinary relief from the juvenile court's order terminating reunification services and setting the matter for a permanency planning hearing pursuant to Welfare and Institutions Code section 366.26[1] for her three-year-old son (Minor).  Mother maintains no substantial evidence supports the juvenile court's finding that (1) returning Minor to Mother would create a substantial risk of detriment to his safety or well-being and (2) the San Francisco Human Services Agency (Agency) provided Mother with reasonable reunification services.

___

[1]  All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

We deny the petition.

## BACKGROUND

*Detention*

In July 2023, the Agency filed a section 300 petition on behalf of then, 16-month-old Minor alleging failure to protect (§ 300, subd. (b)) and abuse of a sibling (*id.*, subd. (j)).[2] Specifically, the petition alleged: there was a substantial risk of harm because Mother, who had been diagnosed with mental health disorders, was not participating in her mental health treatment or taking psychiatric medication; Mother has substance abuse issues, which required assessment and treatment, and she had tested positively for fentanyl and marijuana in December 2022; Mother left Minor in the care of maternal grandmother "despite extensive concerns" about the latter's ability to care for the Minor (boldface & capitalization omitted); Mother and Father[3] have a history of domestic violence against each other; parents have a "long extensive CPS history" (boldface & capitalization omitted), which included several referrals and an active current dependency case involving Minor's brother; and Mother's parental rights had been terminated for Minor's two older half-siblings.

At the detention hearing, the court found a prima facie case had been made that Minor came within section 300, continuance in Mother's home was contrary to Minor's welfare, and reasonable efforts had been made to prevent removal. The court ordered Minor detained and ordered supervised visitation for Mother, and set the matter for jurisdiction and disposition hearings.

---

[2] Minor's then three-year-old brother was also the subject of a dependency proceeding. Mother's rights to the brother were terminated in July 2024. Mother appealed, and Division Three of this court affirmed. (*In re Z.M.* (Mar. 27, 2025, A171125) [nonpub. opn.].)

[3] Father is not a party to this proceeding.

*Jurisdiction and Disposition*

In its jurisdiction/disposition report, the Agency recommended the allegations of the petition be sustained, Minor be declared a dependent of the court, and services be provided even though services could have been bypassed pursuant to section 361.5, subdivision (b).

The Agency reported that in February 2020, Mother's psychologist, Dr. Amy Watt, diagnosed Mother with bipolar disorder, posttraumatic stress disorder, and unspecified personality disorder. In 2021, Minor's brother was detained after Mother stole father's car and intentionally rammed it into another parked car, while the child was in the backseat. In December 2021, Mother was diagnosed with "trauma and stress related disorder, anxiety, depression and unspecified personality disorder," and was prescribed medication. Her therapist reported, as of May 2023, Mother's case had been "closed out" because Mother missed her appointment. Her psychiatrist, Dr. Steven Wozniak, reported Mother's last appointment was in January 2023, and Mother reported she had "stopped taking all medications." In June, Mother completed a new mental health assessment. This time, she was diagnosed with " 'adjustment disorder.' " Mother was scheduled to restart therapy in August.

Since Minor's removal, Mother had been ordered to test twice weekly. She consistently tested positive for marijuana and tested positive for alcohol on five occasions. Despite a prior positive test for fentanyl, in December 2022, Mother had denied knowing what fentanyl was and denied using any other substances besides marijuana and alcohol.

Mother had had "very little contact" with Father, and had previously completed a year and a half domestic violence program. Mother had attended

3

all four scheduled visits. She was "attentive" to both Minor and his brother during visitation and had been "warm and nurturing" to them.

Eighteen-month-old Minor was healthy and developmentally on target. He had been placed with his paternal cousin and was able to see his brother weekly.

The Agency remained concerned that Mother had left Minor unsupervised with the maternal grandmother. Maternal grandmother had a history of child abuse with Mother—which had resulted in her own parental rights being terminated and Mother being adopted. Grandmother also had ongoing substance use issues and was physically unable to care for Minor as she had "limited mobility" and was "disabled in a wheelchair."

Additionally, the Agency was concerned about Mother's "significant mental health" and domestic violence issues, that Mother was not currently in therapy or on medication, and that she had tested positive for fentanyl. The Agency recommended Mother engage in weekly individual therapy, participate in random substance abuse testing, and complete a "parenting program."

In October 2023 addendum reports, Mother's probation officer reported Mother had "several arrests in the last few months," including retail theft and conspiracy to commit a crime in August 2023; driving under the influence in September 2023; and assault with a deadly weapon, false imprisonment, corporal injury on a cohabitant, and damaging a wireless communication device in October 2023. Mother had continued to drug test, and all tests were positive for marijuana, while eight were positive for marijuana and alcohol. The Agency was concerned about Mother's five arrests since December 2022, including driving under the influence, where Mother "flipped" her car, and the domestic violence incident where Mother "attacked and cut her boyfriend

4

with a knife." And while Mother acknowledged maternal grandmother was "still abusing drugs," she had still left Minor and brother with her " 'for days.' "

Accordingly, the Agency changed its recommendation and requested the court bypass reunification services for Minor based on her failure to reunify and the termination of her parental rights to Mother's two oldest children.

In a February 2024 disposition report, the Agency once again recommended the petition be sustained, Minor be declared a dependent of the court, and that reunification services be bypassed. The Agency detailed the family history, beginning in January 2017 with Mother's oldest child. The Agency was also recommending termination of parental rights in the pending dependency case for Minor's brother. The Agency had referred Mother to therapeutic services to help with visitation with both Minor and brother. Mother had completed a parenting program in July 2020, but the Agency referred Mother a second time in January 2023. However, that referral was closed in April 2023 due to "lack of participation." The Agency gave mother another referral in November 2023. Mother's therapist had been seeing Mother twice monthly since August 2023 and was working on managing Mother's "anxiety and depression, interpersonal boundaries, domestic violence relationship and finding healthy ways for self-care." Mother missed four drug tests but made 61 others. She tested positive for marijuana on all 61 tests and tested positive for alcohol on 18 tests.

Minor, now two years old, was an "active, curious toddler." His caregiver recently reported he "gets anxious and throws tantrums" when transportation arrives to take him to visits with Mother, and the daycare reported Minor "eats a lot more than normal" upon his return. Minor was

attached to his caregiver and looked to her for "attention and comfort." Mother had missed two weeks of visits, providing a "written doctor's excuse that she was sick for these two weeks." However, social workers opined Mother was actually on vacation with her boyfriend during this time as evidenced by the boyfriend's social media accounts.

The court declared Minor a dependent, found true the amended allegations in the section 300 petition, ordered reunification services and supervised visitation for Mother, and set the matter for a six-month review hearing.

*Review Period*

In its six-month review report, the Agency reported Mother had been consistently attending parenting classes since December 2023. She had also been participating in a domestic violence group. There had been no new arrests during the reporting period, although a June 2024 police report indicated Mother had been involved in a domestic violence incident with her then-boyfriend, when he "punched a hole in two doors," "shattered the shower glass door," and "threw kitchen knives" at Mother (June incident). The police report indicated Mother "protected herself with a pan" and sought an emergency restraining order. Mother also reported the incident, stating a friend "became aggressive sexually and started destroying her home." She maintained she had " 'cut them off completely' " and " 'got a restraining order.' "

Mother had been working with a new therapist since March 2024. Mother's psychiatrist, Dr. Wozniak, reported Mother "had not been seeing him and currently was not on medication." However, they had recently had an appointment in June 2024, and the psychiatrist reminded Mother "her

6

psychological evaluation had recommended medication." Mother did not follow-up regarding medication.

Mother had missed eight out of 36 scheduled visits. She cancelled a "few visits" with Minor and brother, after reporting she had to go to the emergency room because she had been experiencing "dizzy spells and headaches." She also e-mailed Minor's caregivers that she had " 'just found out I have brain damage due to my car accident and abuse and that it's incurable and I have 9 years to live. I just wanted to let you know.' " When the Agency requested a "release of information" to talk with Mother's doctors, Mother responded she "was fine and that, 'the doctor had mixed up the charts.' " One visit was cancelled due a court date, another because Mother did not have funds for transportation, and another because "her dog made her late."

Mother had tested 20 times, during the reporting period. All tests were positive for marijuana, and one test was positive for alcohol.

In an October 2024 addendum report, the Agency continued to recommend termination of services. Mother's therapist reported Mother was "actively participating and making progress, but there is still a lot of work to be done on [Mother's] end." Mother attended weekly anger management and "domestic [violence] survivor's support" groups. Additionally, Mother was completing her "Family Treatment Court commitment as scheduled." Mother reported she was no longer working with Dr. Wozniak, and she was "self-medicating for her anxiety using marijuana." Mother had tested 21 times during the reporting period, and all results were positive for marijuana, and one was also positive for alcohol.

While Mother had "demonstrated positive engagement in services and interactions at visits over this short time period," the Agency remained

7

concerned about Mother's "long standing history with domestic violence, prior CWS history related to domestic violence, and as of this current case, leaving the minor alone with an unfit adult who has past CWS history." The Agency continued to recommend termination of services as it had not observed Mother "exhibit safe behaviors for an extensive amount of time." Mother had last been involved in a "domestic violence incident" in June—four months before the date of the report.

In a January 2025 addendum report, the Agency's recommendation remained the same. Mother's "domestic [violence] survivor's" support group leader reported Mother's attendance had been "very inconsistent during this reporting period" and that she felt Mother had "not [been] putting in the effort to break herself from the cycle of domestic violence." Mother's therapist stated Mother had discussed "decreasing her THC usage and revisiting getting psychiatric support to address her long standing diagnoses," but that Mother did not often bring up issues with her "long standing history with domestic violence." Mother tested 15 times out of 18 scheduled drug tests—all were positive for marijuana, and two were positive for alcohol.

The social worker had also followed up with Mother's psychologist, Dr. Watt, who had performed a second psychological assessment in March 2024, diagnosing Mother once again with bipolar disorder, posttraumatic stress disorder, and unspecified personality disorder. Dr. Watt stated Mother "was in need of ongoing psychological and medication treatment." She recommended "medications that targeted [Mother's] moods, anxiety, and depression." During a monthly compliance meeting, Mother noted that "per her attorney's recommendation, she decided to re-explore the psychiatric

treatment for her diagnoses," and the Agency submitted a referral for a psychiatric evaluation.

Although Mother continued to participate in some of her support services and engaged in "high quality" visitation with Minor, the Agency remained concerned Mother had not "completely mitigated the safety concerns that continue to keep the family involved with the Agency." Mother's longstanding domestic violence history, along with reports from service providers noting Mother "does not prioritize her domestic violence . . . challenges," gave the Agency "reason to believe that those behavioral patterns have not been diminished." Additionally, Mother had been "slow to adhere to [her psychologist's] recommendations for psychotropic medication to treat her mental health diagnoses," and it was "concerning that [Mother] has continued prolonged marijuana use as a form of self-medicating despite [her psychologist's] trepidations about [Mother's] use . . . impacting her mental health and being used as a primary coping mechanism."

At the combined six-month, 12-month, and 18-month review hearing,[4] the court heard from Mother's evaluator, her social workers, and counsel.[5]

Mother's psychologist, Dr. Watt, testified as an expert "on the psychological testing, evaluation, and interpretation for this hearing." Dr. Watt evaluated Mother in 2020 and in 2024. In the most recent evaluation, Dr. Watt included an "observation of parent-child interaction during one of

___

[4] The six-month review hearing was originally scheduled for August 2024. However, in August, the court rescheduled the six-month hearing to October. At the October hearing, the court granted Mother's request to schedule a contested six/12/18-month review hearing for January 2025. That hearing was heard over several days, and the court ruled on February 4, 2025.

[5] The court also heard from two character witnesses for Mother.

the supervised visits." For both evaluations, Dr. Watt diagnosed Mother with bipolar disorder, posttraumatic stress disorder, and unspecified personality disorder. Dr. Watt stated symptoms related to bipolar disorder can include mood swings, erratic behaviors, agitation and impulse control, and often people with the disorder "stop taking their medication." In Mother's history with the Agency, Dr. Watt saw those symptoms in Mother's "erratic behaviors and aggressive behaviors that led to her arrest in the past" and in her "poor judgment in terms of leaving her children with [maternal grandmother] who has a history of substance abuse and poor mobility that would impair her ability to take care of the young children." Dr. Watt opined Mother's history indicated "symptoms of her psychological disorders have an impact on her overall functioning, and this will likely impact her parenting ability." Additionally, Mother's diagnosis of untreated unspecified personality disorder could be seen in Mother's serious impairments in relationships, such as "getting involved in dysfunctional, volatile relationships." Dr. Watt recommended ongoing psychological and medication treatment.

Dr. Watt did not diagnose Mother with substance use disorder. But she was concerned about Mother's marijuana use and stated she was "at high risk of developing serious addiction issues." Dr. Watt sent her evaluation to the social worker. She recommended Mother be given verbal feedback regarding the results of the evaluations. Although she does not normally go over the evaluation results with parents, Dr. Watt informed Mother at the beginning of both evaluations that she could contact her to go over the results. Mother did not do so. During the second evaluation, Mother mentioned that she felt she had been misdiagnosed during the 2020

evaluation. Dr. Watt did not discuss Mother's diagnosis with her psychiatrist or her therapist, but stated it was not standard procedure for her to do so.

When social worker Sharon Anderson first came into contact with Mother, Minor's brother was in Mother's care under a family maintenance plan. She remained the social worker when both the brother and Minor were removed in June 2023, and until July 2024. Initially, Anderson recommended domestic violence, drug testing, general counseling, a psychological evaluation, and psychotropic medication evaluation and monitoring. Anderson sent a copy of Mother's 2024 evaluation by Dr. Watt to Mother's attorney and her psychiatrist, Dr. Wozniak. Mother consistently tested positive for marijuana and occasionally tested positive for alcohol. After completing a substance abuse evaluation and assessment, it was recommended Mother complete an outpatient program. Mother had been seeing an individual counselor twice a month and had received supervised visitation with Minor. Anderson expressed concern that Mother had already taken a year and a half of domestic violence classes and graduated from a program but continued to engage in domestic violence incidents. Additionally, Mother had been involved in a car accident and had been arrested for driving under the influence.

Taylor Swayzer took over as the case social worker in July 2024. Reunification services, including for a psychological assessment, psychiatric assessment for medication management, individual counseling, domestic violence counseling, and substance use testing, had already been ordered. Swayzer met with Mother once a month and discussed services. Mother provided her with updates. During Swayzer's tenure, visitation progressed to monitored community visitation. Mother wanted to progress to

11

unsupervised, and the Agency was continuing to assess if that would be appropriate.

Mother testified she took "full responsibility for [her] actions," and she asked the court to return Minor to her care. She had stopped using marijuana in January 2025—two weeks before the hearing—"because of the safety of [her] behavior and for [her] children." She also no longer consumed alcohol. Mother was "very confused" about her diagnoses because she had been "diagnosed by multiple different people." No one had "actually sat down and explained to [her] what [she was] diagnosed with." She began seeing Dr. Wozniak six years ago and the "only thing he diagnosed [her] with was adjustment disorder." In June 2024, D. Wozniak wrote a letter stating he and Mother "mutually agreed" she would not take any more medication. Mother was not sure when they "mutually" came to this decision, or if Dr. Wozniak knew about the June incident with her boyfriend. Mother said she was "open to the new opportunities and ways of maybe being on medication that can actually help [her]." She stated she had "misdiagnosed" herself when she told her social worker and Minor's caregiver that she had brain damage and only a few years left to live.

Mother also testified she planned to avoid relationships involving domestic violence. Before entering a relationship, she would "seek into [herself]," "read the bible," and "go grounding." She recognized "the signs of somebody who could potentially be violent" but was "still learning" some "other ones." At the beginning of her therapy, she had talked "a lot" about "issues related to domestic violence." But "since the incident in June, [she] hadn't] felt a need to, but moving forward, we did discuss that there will be more discussions regarding DV and the signs around it." She had not been "involved with anybody" for eight months.

12

Lydia DeGois, Mother's case manager at Homeless Prenatal Program, stated she ran a weekly peer parent support group for women. Mother consistently attended. DeGois described Mother and her participation in the group positively. They talked about domestic violence "almost every week." DeGois acknowledged, however, that she had no formal training and her advice to Mother was akin to "mentor advice." DeGois was aware Mother's drug tests "have came [*sic*] back positive for marijuana." Mother had "tried to quit" marijuana "a couple of times," but was not "able to fully quit." Finally, DeGois recalled Mother sharing her diagnoses with her, but could only recall "depression for sure, PTSD. Those are the two that I know for a fact."

After hearing from counsel, the court found there was a substantial risk of detriment to Minor's safety if he was returned to Mother's care. Although Mother had "made progress" and there were "lots of positive developments in this case," Mother had not made "significant progress in resolving the problems that lead to the child's removal from the home." The court also found, by clear and convincing evidence, reasonable services had been offered throughout the duration of the case. The "requirements of mother's case plan were clear, and I think that the confusion, if any, regarding medication compliance was the result of mother being in denial about her mental health, and perhaps on Dr. Wozniak not having complete information, not because the agency did not provide services." The court disagreed with Mother's "contention" that "lack of a team meeting or a team approach" compelled a finding that she had not been offered reasonable services. The court heard "evidence justifying and explaining the . . . decisions around the team meeting, and . . . that the agency tried numerous times to get in touch with Dr. Wozniak." The court also found the Agency

was "justified in its decision not to progress visits given [Mother's] lack of progress on the domestic violence front, her decision to continue to use marijuana, and on her intransigence around mental health treatment." The court additionally found extending services to 24 months was not in Minor's best interest, there were no exceptional circumstances warranting extending services, and there was no possibility of return in the next six months. Accordingly, the court terminated services and set the matter for a section 366.26 hearing.

**DISCUSSION**

### *Detriment*

Generally, the Legislature has determined a juvenile court may offer family reunification services for a maximum period of 18 months. (§§ 361.5, subd. (a)(3), 366.22; *Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242, 249.) At the 18-month review hearing, the juvenile court must "order the return of the child to the physical custody of their parent" unless it finds, by a preponderance of the evidence, the return of the child "would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child." (§ 366.22, subd. (a).) "The standard for showing detriment is 'a fairly high one. It cannot mean merely that the parent in question is less than ideal, did not benefit from reunification services as much as we might have hoped, or seems less capable than an available foster parent or other family member.' [Citation.] Rather, the risk of detriment must be substantial, such that returning a child to parental custody represents some danger to the child's physical or emotional well-being." (*In re Yvonne W.* (2008) 165 Cal.App.4th 1394, 1400, italics omitted.)

We review the juvenile court's finding of detriment for substantial evidence by considering whether the evidence contradicted or uncontradicted,

14

supports the court's finding. (*Georgeanne G. v. Superior Court* (2020) 53 Cal.App.5th 856, 864–865.) "We resolve all conflicts in support of the determination, indulge in all legitimate inferences to uphold the findings and may not substitute our deductions for those of the juvenile court." (*Id.* at p. 865.)

Mother contends she substantially complied with her reunification services and demonstrated "appropriate parenting," (boldface omitted) and the Agency failed to produce specific evidence of risk of detriment or to produce evidence that her marijuana use supported a risk of detriment.

While it is clear Mother made some progress toward alleviating the issues that led to the dependency petition, the evidence viewed most favorably to the Agency amply supports the court's finding that returning Minor to Mother's care created a substantial risk of detriment.

Although Mother lists a string of services she completed (e.g., graduation from one domestic violence program, attending services at the Women's Resource Center, engaging in therapy, attending a parenting program, voluntary participation in Family Treatment Court, completion of requirements stemming from her DUI arrest, undergoing a psychological evaluation, substance use disorder assessment, seeing a psychiatrist, etc.), compliance with parts of a case plan is not sufficient, by itself, to support a finding Minor's return would not be detrimental, let alone compel such a finding. (See *In re Dustin R.* (1997) 54 Cal.App.4th 1131, 1143 ["simply complying with the reunification plan by attending the required therapy sessions and visiting the children is to be considered by the court; but it is not determinative"].)

From the beginning of the dependency proceedings, and the earlier dependency proceedings involving Minor's brother, the Agency expressed

15

concern about the ongoing domestic violence in Mother's life. And, while Mother attended therapy sessions, she was reluctant to discuss domestic violence after the June 4 incident. Indeed, in the last addendum report before the section 366.22 hearing, the Agency reported the social worker specifically asked Mother's therapist about Mother's longstanding history of domestic violence and what support Mother sought around the issue. The therapist replied, Mother "doesn't bring those issues up often," and "they do not talk about it much either." Further, despite over 18 months of services regarding domestic violence, Mother could not articulate a concrete plan to avoid future domestic violence.

Thus, the court reasonably concluded it had not heard Mother articulate "a clear plan to avoid domestic violence in the future or explain how she would steer clear of domestic violence in a future relationship" beyond her testimony of "grounding and seeking into herself," which the court did not consider "a concrete and realistic plan." The court found it "inexplicable" that Mother had not "been open about discussing domestic violence" after the "frankly very dangerous, incident of domestic violence from June 2024." This showed a profound "lack[] of insight into the issue."

Additionally, from the beginning of the dependency proceedings, the Agency was concerned about Mother's mental health issues and her lack of psychiatric medication treatment. As Mother points out, Dr. Wozniak sent a June 2024 letter to the social worker stating Mother "was feeling much better with therapy" and had "increased stability in her life" and they had therefore "agreed" that holding off on medication "was a reasonable decision." But only weeks before, Mother had been involved in another domestic violence incident, and she was no longer discussing domestic violence with her therapist. Mother testified she could not recall if she told Dr. Wozniak about

16

the June incident before they had "agreed" to defer medication.  The social worker stated she was "not surprised" by Dr. Wozniak's letter "because I believe that [Mother] probably only gave her version of how her situation was."  The court, in turn, found Dr. Wozniak "didn't have all of the information or that mother may have been less than forthcoming about her situation"—a finding wholly supported by the evidence.

The Agency was also concerned about Mother's consistent use of marijuana.  But Mother maintains "there was no evidence of a single instance when Mother's marijuana use was problematic, either when she was taking psychotropic medication or when she stopped the medication."

However, Dr. Watt testified there is a "risk of combination effects, and . . . people react differently with this combination."  Dr. Watt was also concerned, given Mother's consistent use, that she was at risk of developing serious addiction issues.  One of Mother's witnesses testified Mother had "tried to quit" marijuana "a couple of times."  And Mother, herself, testified she had been using marijuana to self-medicate her anxiety but stopped using it a few weeks before the hearing because it made her anxiety "a lot worse and made [her] very paranoid."  She testified, "I remember when I would smoke weed, and I would stay up throughout the night, and my mind was just constantly running.  [¶] I had to, you know, realize what was it that was causing that. [¶] So when I stopped, I realized what it was.  And I am not really familiar with the weed usage of what is really going on with that, but I just thought it was helping.  In reality, it wasn't helping.  It was making things a lot worse."

In sum, substantial evidence supports the trial court's detriment finding.

*Reasonable Services*

In some circumstances, a juvenile court may order more than 18 months of reunification services if it finds that reasonable reunification services have not been provided or offered. (*Michael G. v. Superior Court* (2023) 14 Cal.5th 609, 634–635 (*Michael G.*).) The Agency must design reunification services " 'to eliminate those conditions that led to the court's finding that the child is a person described by Section 300.' [Citation.] Accordingly, a reunification plan must be appropriately based on the particular family's 'unique facts.' " (*In re T.G.* (2010) 188 Cal.App.4th 687, 696.) " ' "[T]he record should show that the supervising agency identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained reasonable contact with the parents during the course of the service plan, and made reasonable efforts to assist the parents in areas where compliance proved difficult. . . ." ' " (*Id.* at p. 697.) One of the components of reunification is visitation, which must "be as frequent as possible, consistent with the well-being of the minor." (*In re Luke L.* (1996) 44 Cal.App.4th 670, 679.)

"A finding that reasonable reunification services have been provided must be made upon clear and convincing evidence. [Citation.] 'When the sufficiency of the evidence to support a finding or order is challenged on appeal, even where the standard of proof in the trial court is clear and convincing evidence, the reviewing court must determine if there is any substantial evidence—that is, evidence which is reasonable, credible and of solid value—to support the conclusion of the trier of fact.' " (*In re Alvin R.* (2003) 108 Cal.App.4th 962, 971 (*Alvin R.*); *In re V.L.* (2020) 54 Cal.App.5th 147, 155 [reviewing court will uphold finding based upon clear and convincing evidence if " 'record as a whole contains substantial evidence from

18

which a reasonable fact finder could have found it highly probable that the fact was true' "].)

Mother maintains the Agency "failed to provide reasonable services to address [her] mental health issues" (boldface omitted) and failed to provide the opportunity for unsupervised visitation.

*Mental Health*

Without any citation to the record, Mother asserts the "most important addition" to her reunification plan for Minor was the "court-ordered psychological evaluation." She maintains this evaluation was pivotal "and should have been seen as a beacon to which other services and support should look." Mother contends neither the Agency nor Dr. Watt explained the results of her evaluation, nor did the Agency "form[] a treatment team for Mother," as recommended by Dr. Watt.

However, at the hearing, the social worker explained it was Agency policy to forward the evaluations to Mother's attorney and not to discuss the evaluation with the parties. Mother does not claim her attorney did not receive the evaluation or discuss it with her. Indeed, we note that on the eve of the hearing, Mother indicated a new willingness to resume taking medication, in part, because of discussions with her counsel. The January 2025 addendum report had likewise stated, "per her attorney's recommendation, [Mother] decided to re-explore the psychiatric treatment for her diagnoses," and the social worker accordingly submitted another referral for a psychiatric evaluation. Moreover, one of Mother's own witnesses testified Mother had spoken to her about her diagnoses.

The social worker also testified she forwarded a copy of the evaluation to Dr. Wozniak. Mother faults the Agency, however, because the social worker "did not hear back from [Dr. Wozniak] and did not speak to him

19

regarding the evaluation," and his letter "is silent as to the evaluation." But as the court observed, Dr. Wozniak was hard to get in touch with and the Agency attempted to contact him multiple times.

In any event, Mother ignores that she could have contacted Dr. Watt for an explanation of the evaluation results. Dr. Watt testified, "A lot of times after I finish with the evaluations, I do not hear back from clients. And sometimes the clients want to know what the results are, and they would contact me directly. . . . And . . . if they want to know the content of the report, then I would initiate a phone call with them. [¶] . . . And sometimes the clients would insist on reading the reports, and sometimes I heard that lawyers would let them hear—read the reports and they have a lot of questions. And then I would be contacted, and I would initiate a phone call with them." After both the 2020 and 2024 evaluations, Dr. Watt advised Mother she could call to discuss the evaluations. Mother never did so.

Mother also ignores that throughout the proceedings she voluntarily stopped and started medication. For instance, after she was evaluated in 2020, she was prescribed medication, which she stopped taking after Minor's brother was returned to her. She restarted medication in July 2023, when the instant dependency proceedings began but had stopped again by June 2024. In December 2024, a few weeks before the hearing, she told the social worker she had decided to reexplore psychiatric treatment, at which point the social submitted a new referral for a psychiatric evaluation.

Finally, even if a "team" approach might have been a better approach to Mother's mental health issues, this does not undermine the juvenile court's reasonable services finding. "Reunification services need not be perfect. [Citation.] . . . Services will be found reasonable if the Department has 'identified the problems leading to the loss of custody, offered services

designed to remedy those problems, maintained reasonable contact with the parents during the course of the service plan, and made reasonable efforts to assist the parents in areas where compliance proved difficult. . . ." (*Alvin R., supra*, 108 Cal.App.4th at pp. 972–973.)  As the court observed, while Mother argued "the lack of a team meeting or a team approach compels a finding that reasonable services offered were not reasonable," the court "disagree[d] with that view.  I think that under the totality of the circumstances the absence of a team meeting or a team approach, if any, does not mean that services were not reasonable.  I heard evidence justifying and explaining the decision—the agency's decisions around the team meeting."

Mother's reliance on *Michael G., supra,* 14 Cal.5th 609, is misplaced. There, the juvenile court found the Agency had *not* provided reasonable services between the 12- and 18-month hearings, but nevertheless declined to exercise its discretion to order further services because "additional services would neither be in [minor's] best interests nor reasonably likely to lead to reunification." (*Id.* at p. 622.)  Father filed a writ petition arguing he was entitled to an extension of services.  The Court of Appeal denied the petition. (*Id.* at p. 620.)  The Supreme Court granted review and affirmed, agreeing with the appellate court (*ibid.*) that "a parent who is denied reasonable services between the 12- and 18-month hearings is not statutorily entitled to an automatic extension of services at the 18-month review." (*Id.* at pp. 634– 635.)  Rather, in cases where a juvenile court finds a parent *did not* receive reunification services in the immediately preceding 12- to 18-month review period, a parent may seek an extension of services either pursuant to section 366.22, subdivision (b) (applicable if a parent falls into a "narrow subset" of categories and the extension is in the child's best interest (*Michael G.,* at p. 629)) or section 352 (applicable if there are "exceptional

21

circumstances" and continuance of services is not contrary to the child's best interests). (*Id.* at pp. 634–635.)

Here, in contrast, the juvenile court did not find Mother had not received reasonable services but found the opposite—that she *did* receive reasonable services. And as we have discussed, ample evidence supports that finding. Moreover, we note Mother does not fall into the "narrow subset" of parents specified in section 366.22, subdivision (b),[6] and the court determined there were no "exceptional circumstances" and continuation would be contrary to Minor's best interest pursuant to section 352.

*Visitation*

From the beginning of these proceedings, Mother was allowed supervised three-hour visits, twice a week. Her visitation then progressed from supervised, to monitored in the community, meaning Mother could take Minor to the mall, playground, etc. The next step would have been a "case consult" to progress to unsupervised visitation. And in August 2024, shortly after the June domestic violence incident, Mother told the social worker she was hoping to progress in her visitation. The social worker told Mother she would "continue assessing" the situation and then spoke with Mother's attorney to "discuss[] what the issues were." She also spoke to the visitation supervisor, who was "also advocating on [Mother's] behalf."

---

[6] The subset of parents specified in section 366.22, subdivision (b) includes: a parent "who is making significant and consistent progress in a court-ordered residential substance abuse treatment program, a parent who was either a minor parent or a nonminor dependent parent at the time of the initial hearing making significant and consistent progress in establishing a safe home for the child's return, or a parent recently discharged from incarceration, institutionalization, or the custody of the United States Department of Homeland Security and making significant and consistent progress in establishing a safe home for the child's return." (§ 366.22, subd. (b)(1).)

22

At an October meeting about visitation, the social worker explained to Mother "we need to see the change [as to domestic violence] happen over an extensive period of time," and at that point in time it had been only four months since the last domestic violence incident. The social worker did not give Mother a timeline, but said, "if we are talking about patterns, the time line between the last two events was eight months, and that is the longest she had gone without incident. And so that was something that the agency would want to see."

In December, Mother and her counsel requested an assessment to progress in visitation. The social worker stated, "assessments are ongoing" and the Agency needed "to see an extended period of time where there are no safety concerns. And . . . the period between her last two incidents is only eight months. So [the social worker] would like to see [Mother] practice more safe behaviors for a longer period if [she] were to call a case consult." By the time of the January hearing Mother had just reached the eight-month marker. And, as the juvenile court observed Mother had shown a "lack of progress on the domestic violence front."

Mother cites *Tracy J. v. Superior Court* (2012) 202 Cal.App.4th 1415 (*Tracy J.*), in support of her assertion that the Agency's failure to afford her unsupervised visitation constituted "a failure to offer reasonable services." This case is also distinguishable.

In *Tracy J.*, the agency filed a petition alleging the parents were developmentally disabled and could not provide regular care for the minor. (*Tracy J., supra*, 202 Cal.App.4th at p. 1419.) The mother's condition made it difficult to feed and hold the minor, and she tested in the borderline range of intellectual functioning, while the father tested "in the lower range of mildly mentally retarded." (*Id.* at pp. 1419–1420.) Initially, the parents were

provided one supervised visit per week.  (*Id.* at p. 1420.)  At the six-month review hearing, the juvenile court continued reunification services and authorized the agency to implement unsupervised visits, overnights, and a 60-day home visit.  (*Ibid.*)  At the time of the 12- and 18-month review hearing (and at the minor's sister's jurisdictional and dispositional hearing), the agency recommended termination of services for the minor and six months of services for the sister.  (*Ibid.*)  The court found return of the minor to parental custody would be detrimental and reasonable services had been provided.  However, in the sister's case, the court ordered the agency to implement short, unsupervised visits between the parents and the sister.  (*Id.* at pp. 1422–1423.)  The parents petitioned for writ relief as to the minor.  The father maintained he was not afforded a reasonable opportunity to demonstrate he could safely care for the minor because visitation remained limited and supervised, and the mother maintained she was not afforded services tailored to her physical disabilities.  The Court of Appeal agreed.  (*Id.* at p. 1425.)

The appellate court pointed out that the visitation supervisor stated the parents demonstrated a parental role with the minor, and later, the professionals involved in the case all positively described the parents' interactions with the minor.  (*Tracy J., supra*, 202 Cal.App.4th at p. 1426.)  Despite these reports, the social worker had not advanced visitation stating she "would feel 'uncomfortable' leaving [the minor] alone with his parents." (*Ibid.*)  However, the social worker only described one incident in more than a year that might have implicated the minor's safety—when he fell and bumped his head when he was learning to walk.  (*Ibid.*)  Further, any concerns about "unsupervised visitation could have been alleviated" through services with the regional center and public health nurse and by

24

"implementing in-home parenting skills training during a portion of the unsupervised visits, and providing initial drop-in checks by the social worker." (*Id.* at p. 1427.) Finally, the juvenile court's order in the minor's sister's case "reveal[ed] the deficiencies in services in T.J.'s case." For example, the court had ordered the agency to "implement short, *unsupervised* visits with [the sister]; notify parents of, and encourage them to attend, [the sister's] medical appointments; *not* allow the foster mother to supervise visits; engage the services of the public health nurse; refer the parents to . . . a parenting program for parents with disabilities . . . ; and follow up with [the regional center] to obtain services for [the mother]." (*Ibid.*) None of those orders were made in the minor's case. (*Ibid.*)

As we have recited, the record here is markedly different, and substantial evidence supports the juvenile court's finding reasonable services were provided both as to Mother's mental health and as to visitation.

## DISPOSITION

The petition for extraordinary writ is denied on the merits. (See § 366.26, subd. (*l*); *In re Julie S.* (1996) 48 Cal.App.4th 988, 990–991.) We deny the request for stay, and our decision is final immediately. (Cal. Rules of Court, rules 8.452(i), 8.490(b).)

25

_____
Banke, J.

We concur:


_____
Humes, P. J.


_____
Langhorne Wilson, J.

A172430, J.G. v. Superior Court of City and County of San Francisco